# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
December 15, 2015 Session

## TOM SLAGLE, ET AL. v. THE CHURCH OF THE FIRST BORN OF TENNESSEE, ET AL.

### Appeal from the Chancery Court for Robertson County
No. CH11CV10274, CH11CV10702     Laurence M. McMillan, Jr., Chancellor

_____

### No. M2015-00297-COA-R3-CV – Filed August 7, 2017
_____


A dispute among members of a church arose over control of the church. One group of church members incorporated, and then individual members of the church filed suit against the corporation and a second entity that operated a school on church property. On cross-motions for summary judgment, the trial court determined that the organizational structure of the church was "connectional" or "hierarchical" in nature and that all property of the church was under the control of the church's board of deacons. Because we conclude that there are genuine issues of material fact that preclude entry of summary judgment, we affirm in part and reverse in part.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; and Remanded

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Larry L. Crain, Brentwood, Tennessee, and Joshua R. Denton and D. Hiatt Collins, Nashville, Tennessee, for the appellants, Church of the First Born of Tennessee, Inc. and Dayspring Academy.

Joe M. Haynes, Goodlettsville, Tennessee; Keith Jordan, Nashville, Tennessee; and J. Thomas Smith, Franklin, Tennessee, for the appellees, Tom Slagle, Billy H. Ray, Earl B. Thompson, Kelvin Gregory, Chester H. Cole, Gary Kelley, Roger Ray, Michael Spears, and COFB Association.

# OPINION

## I.

### A. THE CHURCH OF THE FIRST BORN

In 1933, Prator Donald "P.D." Hardin formed the Church of the Firstborn[1] (the "Church"), acting as its first elder/overseer. As elder/overseer, he served as the pastor and spiritual leader of the Church.

P.D. Hardin led the construction of the Church's first building in New Deal, Sumner County, Tennessee, in 1936. During that same time period, a Church congregation also met at Hartsville in Trousdale County. Later Church congregations would meet in Portland in Sumner County and Nashville in Davidson County. But, by the 1980s, the Church had only two locations: Hartsville in Trousdale County and White House in Robertson County.

Outside of spiritual matters, governance of the Church, an unincorporated association, could best be described as informal. Trustees held title to real property owned by the Church and executed documents on behalf of the Church. A board of deacons handled many of the business and temporal affairs of the Church. Historically, the elder/overseer selected deacons, but the manner for selection of trustees is a matter of dispute. Although P.D. Hardin allegedly drafted bylaws for the Church, the precise role of deacons and, to a lesser extent, the trustees in the Church is also disputed.

P.D. Hardin remained as elder/overseer of the Church until his death on September 19, 1983. Before his passing, he selected his nephew, Bob C. Hardin, to succeed him. During Bob Hardin's tenure as the elder/overseer, the Church began construction of a private Christian school on land in Robertson County adjoining the White House sanctuary. The school, which was named Dayspring Academy, opened in August 2006.

Bob Hardin died in 2008 without naming a successor elder/overseer. He had, however, selected Robbie Kline to be the pastor of the Hartsville congregation and Roger Brewer to be the pastor of the White House congregation.[2] At Bob Hardin's death, the board of deacons had seven members: John Edward Andrews, Mickey Andrews, Kelvin Gregory, Jon James, Billy H. Ray, Tom Slagle, and Earl B. "Brownie" Thompson.

---

[1] The Church is sometimes referred to as the "Church of the First Born." Testimony in the record indicates that the name originated from the *Bible*, in which the Apostle Paul wrote, "To the general assembly and church of the firstborn, which are written in heaven, and to God the Judge of all, and to the spirits of just men made perfect." *Hebrews* 12:23 (King James).

[2] Some of the Church's leaders and members are of the opinion that Pastor Brewer's appointment was only intended to be temporary, until such time as Elder Bob Hardin could return to the pulpit.

## B. CHURCH SCHISM

After Elder Bob Hardin's death in 2008, disagreements arose amongst the Church's members. The underlying basis for the disagreements is itself a matter of dispute. Some members claim that the dispute centers over "the Church's doctrinal position on the sacrament of baptism and its twenty-year long practice of using a Hebrew version of the name of God as a central tenant." Others trace the disagreements to Dayspring Academy and the "substantial and continuing costs of subsidizing" its operation.

Though the precise timeline is unclear, dissension grew, and the members chose sides. Certain members, including deacons, who formerly worshiped at White House, moved their attendance to Hartsville. The minutes of the March 13, 2010 meeting of the deacons reflect the tensions between those attending services in White House and those attending services in Hartsville.

During the meeting, which was held in White House, the chairman of the deacons, Tom Slagle, complained that Church members who attended in Hartsville were being asked to leave the premises in White House. After commenting that the Church had no leader, he advocated for the "deacons to take charge" and "to put all this to rest." The minutes reflect that the deacons voted "to take control of all functions of the Church of the Firstborn."

Mr. Slagle sent a letter to Roger Brewer, pastor at White House, advising him of the vote of the deacons. The letter, dated March 13, 2010, stated that the deacons would assume control of the following functions of the Church, "just to name a few":

1. Security of the Church of the Firstborn, Dayspring Academy, and all property owned by Church of the Firstborn

2. Taping program

3. Official record of attendance and all official functions of the secretary of the Church of the Firstborn

4. Campground

5. All business functions of the Church of the Firstborn and Dayspring Academy

But the disagreements continued.

3

At the board of deacons meeting on Saturday, August 7, 2010, the deacons discussed a meeting in Hartsville the previous Sunday. As relayed by the deacons, members worshipping in Hartsville expressed concerns about the Church's finances, the funding of Dayspring Academy, unmet needs in Hartsville, and their lack of input on spending. Some members wanted to separate the offerings from Hartsville and White House, and some objected to their offerings being used to fund Dayspring Academy. Concerns also included the divisions between White House and Hartsville and a rumor that the Church might sell the Hartsville sanctuary to raise revenue.

The deacons also discussed declining Church revenues and the differences among members of the Church. To address the financial concerns, the deacons debated cutting costs at or possibly closing Dayspring Academy. The minutes reflect that Mr. Slagle declared that "We will not save both; it is save the church or save the school." Another deacon indicated that the Church's problems were "spiritual," and some of the deacons suggested that the pastors, Robbie Kline in Hartsville and Roger Brewer in White House, needed to get together.

The same day as the deacons' meeting, Pastor Brewer circulated a three-point statement of faith and requested that it be signed to indicate assent to upholding the Church's "doctrine." Some versions of the statement of faith included the following sentence: "We do not and will not accept or fellowship any other plan of salvation or any other baptism formula." Deacons Ed and Mickey Andrews signed a version of the statement of faith that included the quoted sentence, but the remaining five deacons did not. Also among those failing to sign the statement of faith was Evelyn H. Cole, the Church secretary and daughter of P.D. Hardin.

The following Wednesday, Pastor Brewer gave a sermon in White House. The sermon addressed people who had "stop[ped] putting their money in the offering plate." In the sermon, Pastor Brewer also declared: "This congregation will not — and I want you all to 'amen' me if you agree with me. This congregation will not step aside and allow Dayspring Academy's funding to stop. It won't happen."

A few days later, Mr. Slagle sent two letters on behalf of the board of deacons. The first letter, directed solely to Pastor Brewer, demanded that he stop circulating the statement of faith. In the letter, Mr. Slagle complained that a majority of the deacons had not seen the statement of faith before it was circulated. He also claimed to be in possession of "the original bylaws of the Church of the Firstborn written by Brother [P.D.] Hardin" and suggested that Pastor Brewer's statement of faith could constitute a violation of those bylaws.

The second letter, directed to Pastor Brewer and Pastor Kline, referred to "a crisis that affects all of us as members" and referenced the possibility of "dissolution." The letter advised that an attorney had been hired "to advise us through a mediation process

4

that will reach an amicable resolution." The letter included a proposed "AGREEMENT FOR MEDIATION AND ARBITRATION." If the mediation proved unsuccessful, the agreement committed the signatories to binding arbitration of the conflict.

Pastor Kline, along with Deacons Slagle, Ray, Thompson, Gregory, and James, signed the AGREEMENT FOR MEDIATION AND ARBITRATION. Pastor Brewer and Deacons Ed and Mickey Andrews did not.

Despite the disagreements, all seem to acknowledge November 21, 2010, as the date that the Church split. Prior to that date, Pastor Brewer decided that the Church's leadership could not include members that had not signed his statement of faith. So he nominated a new slate of deacons and a new Church secretary. Pastor Brewer's nominees for deacon included existing deacons Ed and Mickey Andrews, who had signed the statement of faith, and five others to replace the deacons that had not signed. On November 21, members attending in White House voted to "affirm" Pastor Brewer's nominees for board of deacons and Church secretary.

Also on November 21, and at least partially in response to the vote in White House, Mr. Slagle, who was by then attending services in Hartsville, presented the members there the bylaws purportedly written by P.D. Hardin. Members present signed a statement ratifying the bylaws, which were described as "the foundation of the Church of the Firstborn as it was established in its beginning."

## C. CHURCH PROPERTY

"And it must follow, as the night the day,"[3] the split raised the question of control over the Church's property in Robertson and Trousdale Counties. A financial statement for the Church issued in 2008 showed the properties and improvements had a value in excess of $14 million. At least five distinct tracts of land[4] are titled in the names of trustees for the use and benefit of the Church.

In Robertson County, the White House sanctuary sits on approximately 17.6 acres. The property was acquired in May 1972 using funds raised by the Church's ladies auxiliary. The Dayspring Academy campus and a church-operated campground, known as Camp Le'Prat, sit on a larger tract of land, which was formerly known as the "Neal property."[5] Acquired in February 1969, P.D. and Lela Hardin, Chester and Evelyn Cole,

---

[3] WILLIAM SHAKESPEARE, HAMLET, act 1, sc. 3.

[4] We summarize and estimate the acreage of the real property currently held for the use and benefit of the Church.

[5] Dayspring Academy sits on roughly 25 acres of the former Neal property, and Camp Le'Prat sits on approximately 87 acres adjacent to the school. While the campground was also created out of the

Aubrey and Betty Gill, and Billy and Barbara Ray purchased the Neal property for $65,000. They then deeded the property to trustees for the use and benefit of the Church. The surviving grantors claim they retained a right of first refusal should the property ever be sold.[6]

Between 1973 and 1998, the Church acquired interests in several other significant tracts of land in Robertson County. The record is unclear as to how many of these properties in which the Church still retains an interest.

In Trousdale County, the Church has an interest in two lots: an improved lot of 3.542 acres, which includes a sanctuary, and an adjoining lot of 2.12 acres. The sellers of the property on which the sanctuary sits, David and Theresa Parker, placed two restrictions in the deed. First, the property was "to be used for church purposes or church charity purposes only." Second, the Parkers retained "the right of first refusal" if the property was ever sold.

D. PROCEEDINGS BELOW

The question of control over the Church property led to the filing of complaints in both Robertson and Trousdale Counties. We previously addressed the suit filed in Trousdale County. *See Church of the First Born of Tenn., Inc. v. Slagle*, M2014-01605-COA-R3-CV, 2017 WL 2555671 (Tenn. Ct. App. June 13, 2017) [hereinafter *Church of the First Born I*]. The proceedings in Robertson County began on March 8, 2011, with the filing by Mr. Slagle and other individuals[7] (the "Slagle Plaintiffs") of a complaint to quiet title in chancery court. The complaint named as defendants Pastor Brewer, Ed and Mickey Andrews, and "other John Doe Defendants as agents for the Church of the First Born of Tennessee, a Tennessee corporation, and Dayspring Academy, a Tennessee corporation." As we described in *Church of the First Born I*, the Church of the First Born of Tennessee (the "Church Corporation") was a nonprofit, religious corporation formed following the Church split. Its charter recognized both Pastor Brewer and Deacon Ed Andrews as authorized to act on the Church Corporation's behalf. *Id*. at *6.

---

Neal property, the Church expanded Camp Le'Prat with the acquisition of an addition 12.3 acres in March 1969.

[6] Though the surviving grantors claim to have donated the Neal property to the Church, evidence in the record also indicates that the Church assumed the balance of the grantors' mortgage and/or paid $200,000 as consideration for the property.

[7] Besides Mr. Slagle, the plaintiffs included the other deacons who had declined to sign Pastor Brewer's statement of faith, Jon James, Kelvin Gregory, Billy Ray, and Earl B. "Brownie" Thompson, and one of the Church trustees, Chester Cole, named on the deeds to the disputed real property. The plaintiffs also included Gary Kelley, Roger Ray, and Michael Spears, who allegedly had been elected trustees by Hartsville members on February 6, 2011, to replace trustees that had died.

The Church Corporation and Dayspring Academy, also a nonprofit corporation, responded to the complaint to quiet title with counterclaims and a third-party complaint against Ms. Cole for libel of title. The Slagle Plaintiffs then filed, also in chancery court, a separate action against the Church Corporation only. The claims against the Church Corporation largely mimicked the claims asserted by the Church Corporation and Dayspring Academy in their counterclaim.

Ultimately, the parties agreed to the consolidation of the actions and the dismissal of certain claims without prejudice. From the original action filed by the Slagle Plaintiffs, the claims against all defendants other than Dayspring Academy were dismissed, and from the separate action against the Church Corporation only, the claim for libel of title was dismissed. This left the Slagle Plaintiffs' claims against both the Church Corporation and Dayspring Academy for a declaratory judgment that Chester H. Cole, Earl B. "Brownie" Thompson, Gary Kelly, Roger Ray, and Michael Spears, as trustees, were "the rightful owners of all real, personal and mixed property" of the Church, to quiet title to the property, for ejectment from the Robertson County properties, for conversion of "personal property and mixed property," for an accounting of rental revenue, for unjust enrichment, and for injunctive relief. The Slagle Plaintiffs also asserted a claim for tortious interference with contract, but only against the Church Corporation.

The Church Corporation and Dayspring Academy agreed to the dismissal of their third-party claim against Ms. Cole. This left the Church Corporation and Dayspring Academy with their request for a declaratory judgment that Randy Cline, David Mayhew, and Tim Hunter, as trustees of the Church Corporation, were "the rightful owners of all real, personal and property" of the Church and claims to quiet title to the property, for ejectment of the Slagle Plaintiffs from the Hartsville sanctuary, for conversion of "personal property and mixed property," for an accounting of all Church property, and for injunctive relief.

The Church Corporation and Dayspring Academy moved for partial summary judgment. They requested that a congregational vote be ordered to determine control of Church property. Specifically, the motion asserted that:

> Under the ecclesiastical abstention doctrine, the Court cannot decide matters touching on church governance, doctrine and faith, but may decide — through the use of neutral principles of law — which party is entitled to control the Church's property. There are no genuine issues of material fact with respect to (i) whether the Church is a congregational church; and (ii) whether a congregational vote is required to determine who is entitled to control the Church's property. Accordingly, in light of the undisputed material facts and controlling Tennessee law, this Court should enter partial summary judgment ordering a congregational vote to determine the will of

7

the majority of the Church's members regarding who is entitled to control the Church's property.

The Slagle Plaintiffs filed their own motion for summary judgment. Although not designated as such, their motion appeared to also only request partial summary judgment, namely a determination that the trustees of the Church "retain[ed] title and ownership of the properties at issue before the Court."

The trial court entered an order granting the motion of the Slagle Plaintiffs and denying the motion of the Church Corporation and Dayspring Academy. In its ruling, the court made conclusions of law and factual findings based on the parties' filings:

1. Prior to November 21, 2010, all Robertson County real estate at issue in this case was held in the name of or by Trustees for the benefit of The Church of the Firstborn, an unincorporated association.

2. Prior to November 21, 2010, all decisions to purchase, encumber or to sell real estate were made by the duly appointed Board of Deacons for the Church of the Firstborn subject to a two-thirds majority vote of the affected congregation.

3. Prior to November 21, 2010, all members of the Board of Deacons for the Church of the Firstborn were appointed by the Elder/Overseer. None of these appointments were subject to confirmation of any vote of any congregation.

4. On November 21, 2010, a vote was taken for the first time in the history of the Church by the White House congregation only to elect a new Board of Deacons. The new Board took exclusive control over the Robertson County Church properties by changing the locks at the Church offices and recreational facilities.

5. On January 24, 2011, the newly elected Board and Deacons from the White House congregation incorporated The Church Of The Firstborn, a Tennessee Corporation, and adopted bylaws.

6. Prior to November 21, 2010, the organizational structure of the Church was not congregational, but was more "connectional" or "hierarchical," due to the centralized decision making powers vested in a single Elder/Overseer and the Board of Deacons appointed by him without any congregational vote or confirmation. . . .

7. No change of ownership or control of Church property which is

8

supported by the organizational structure of the Church or its historical real estate transactions has occurred for all Robertson County real estate at issue in this case.

   8. Therefore, all real estate held by or for the benefit of the Church of the Firstborn, an unincorporated association, is under the control of the Board of Deacons as appointed by the Elder/Overseer prior to November 21, 2010.

Later, the trial court certified its judgment as a final judgment. *See* Tenn. R. Civ. P. 54.02. And this appeal by the Church Corporation and Dayspring Academy followed.

## II.

On appeal, the Church Corporation and Dayspring Academy assert that the trial court erred in three respects. First, they submit that the "trial court erred in holding that the Church is hierarchical, not congregational." Second, they submit that the "trial court erred in failing to order a congregational vote to determine ownership of the Church's property where the ecclesiastical abstention doctrine and a neutral principles of law analysis require a congregational vote." Finally, they submit that the "trial court erred in failing to order a vote of the entire congregation of the Church, with membership consisting of those persons regularly attending the Church in the months prior to the November 21, 2010 split."

### A. STANDARD OF REVIEW

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *see also Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008). As noted above, both parties moved for summary judgment, supported by statements of undisputed facts. When considering cross-motions for summary judgment, the trial court "must rule on each party's motion on an individual and separate basis." *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 83 (Tenn. 2010). For the respective competing motions, the trial court must view the evidence in the light most favorable to the opposing party and draw all reasonable inferences in the opposing party's favor. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). The court is not to "weigh" the evidence when evaluating a motion for summary judgment. *Martin*, 271 S.W.3d at 87.

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin*, 271 S.W.3d at 84; *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law.

9

*Martin*, 271 S.W.3d at 84; *Blair*, 130 S.W.3d at 763. Accordingly, we must review the record de novo and make a fresh determination of whether the requirements of Tennessee Rule of Civil Procedure 56 have been met. *Eadie v. Complete Co.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair*, 130 S.W.3d at 763.

## B. ECCLESIASTICAL ABSTENTION DOCTRINE

The Tennessee Supreme Court has recognized that "[t]he courts do not inhibit the free exercise of religion simply by opening their doors to a suit involving a religious organization" and "that, like other societal institutions, they may be amenable to suits involving property rights, torts, and criminal conduct." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 450 (Tenn. 2012). But "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). They must be decided "without resolving underlying controversies over religious doctrine." *Id.* Under the ecclesiastical abstention doctrine, civil courts "'abstain' from adjudicating issues involving theological or spiritual judgment or the internal governance of religious bodies," leaving those issues instead "to appropriate religious tribunals."[8] *Redwing*, 363 S.W.3d at 446 (citing 1 RODNEY A. SMOLLA, RIGHTS & LIABILITIES IN MEDIA CONTENT: INTERNET, BROADCAST, & PRINT § 6:25 (2d ed. 2011)); *see also Lewis v. Partee*, 62 S.W. 328, 333 (Tenn. Ch. App. 1901) ("It is unquestionably true that the courts have no ecclesiastic jurisdiction, and do not pass upon questions of faith, religion, or conscience; nor will they in fact undertake to revise or to inquire into the propriety or justice of the action of a church upon any matter not affecting a property or civil right.").

Where we can resolve intrachurch disputes, we must do so "by applying neutral legal principles." *Redwing*, 363 S.W.3d at 450; *Anderson v. Watchtower Bible & Tract Soc. of New York, Inc.*, No. M2004-01066-COA-R9-CV, 2007 WL 161035, at \*7 (Tenn. Ct. App. Jan. 19, 2007). For property disputes, our courts have taken the neutral principles approach to require a determination of whether the church involved is

---

[8] Our courts have often discussed the ecclesiastical abstention doctrine as a jurisdictional bar. *See, e.g.*, *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 450 (Tenn. 2012) ("There can be little question that the state and federal courts are currently sharply divided regarding the courts' subject matter jurisdiction over suits involving claims similar to those asserted by Mr. Redwing in this case."); *Anderson v. Watchtower Bible & Tract Soc'y of New York, Inc.*, No. M2004-01066-COA-R9-CV, 2007 WL 161035, at \*4 (Tenn. Ct. App. Jan 19, 2007) ("[C]ourts in this country do not exercise jurisdiction over purely ecclesiastical, religious, or theological disputes."). But the doctrine, like the ministerial exception, might be more properly seen as an affirmative defense. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 195 n.4 (2012) (holding that the ministerial exception "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar"). In cases involving intrachurch disputes, the issue is not whether the court has power to hear the case but rather whether the allegations entitle the plaintiff to relief. *See id.*

hierarchical/connectional or congregational. *See, e.g., Convention of Protestant Episcopal Church in Diocese of Tenn. v. Rector, Wardens, & Vestrymen of St. Andrew's Par.*, No. M2010-01474-COA-R3-CV, 2012 WL 1454846, at *14 (Tenn. Ct. App. Apr. 25, 2012) [hereinafter *St. Andrew's*]; *Avondale Church of Christ v. Merrill Lynch*, No. E2007-02335-COA-R3-CV, 2008 WL 4853085, at *6 (Tenn. Ct. App. Nov. 10, 2008); *Fairmount Presbyterian Church, Inc. v. Presbytery of Holston of Presbyterian Church of U.S.*, 531 S.W.2d 301, 302 n.1 (Tenn. Ct. App. 1975). If the church is hierarchical or connectional,[9] we "must accept the decision of the highest church authority to which a dispute has been appealed, [e]ven when the dispute involves church property." *Fairmount Presbyterian Church, Inc.*, 531 S.W.2d at 304. If the church is congregational, "unless there be shown some law, regulation, rule, or practice of the church determining otherwise," the will of the majority determines the outcome. *Nance v. Busby*, 18 S.W. 874, 875 (Tenn. 1892).

According to the United States Supreme Court, a hierarchical church is one "organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 110 (1952). This Court has favorably cited a six factor test to determine whether a church is hierarchical:

> (1) the affiliation of the local church with a parent church, (2) an ascending order of ecclesiastical judicatories in which the government of the local church is subject to review and control by higher authorities, (3) subjugation of the local church to the jurisdiction of a parent church or to a constitution and canons promulgated by the parent church, (4) a charter from the parent church governing the affairs of the local church and specifying ownership of local church property, (5) the repository of legal title, and (6) the licensing or ordination of local ministers by the parent church.

*St. Andrew's*, 2012 WL 1454846, at *15 (quoting *Masterson v. Diocese of Nw. Tex.*, 335 S.W.3d 880, 890 (Tex. Ct. App. 2011), *rev'd on other grounds*, 422 S.W.3d 594 (Tex. 2013)).

A congregational church, on the other hand, is independent, and "its members constitute the highest authority on ecclesiastical matters, including church governance and discipline." *Id.* at *14 (citing *Nance*, 18 S.W. at 881). A congregational church "owes no fealty or obligation to any higher [human] authority." *Watson v. Jones*, 80 U.S. 679, 722 (1871).

---

[9] "The courts in Tennessee have used the term 'connectional' to mean the same thing as 'hierarchical.'" *St. Andrew's*, 2012 WL 1454846, at *20 n.16.

The neutral principles approach used in Tennessee is not without problems. One, which is a problem shared by the courts of some other states, is that dividing churches into one of two categories and then, if the church is hierarchical, giving deference to the highest authority within the church is not a neutral principle of law. Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 ARIZ. L. REV. 307, 309 (2016). Such an approach has been described as a "hybrid approach." *Id.* at 322-24. The fact that our courts have not applied a strict neutral principles of law approach in intrachurch property disputes becomes clear with a reading of *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367 (1970).

In *Church of God at Sharpsburg, Inc.*, Justice Brennan explained in a concurrence that "a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id.* at 368 (Brennan, J., concurring). One permissible approach was the approach ultimately adopted by Tennessee, namely to "enforce the property decisions made within a church of congregational polity 'by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government,' and within a church of hierarchical polity by the highest authority that has ruled on the dispute at issue, unless 'express terms' in the 'instrument by which the property is held' condition the property's use or control in a specified manner." *Id.* at 368-69 (internal citations and footnotes omitted) (quoting *Watson*, 80 U.S. at 722, 724); *Nance*, 18 S.W. at 875.

Justice Brennan then goes on to describe two additional, permissible approaches, one of which is designated the neutral principles of law approach. Under that approach, "civil courts can determine ownership by studying deeds, reverter clauses, and general state corporation laws." *Church of God at Sharpsburg, Inc.*, 396 U.S. at 370 (Brennan, J., concurring).

Another problem is that "many religious associations are neither 'congregational' nor 'hierarchical,' and it is no easy task for a court to determine where along the spectrum a given church lies." McConnell & Goodrich, *supra*, at 327-28. Stated another way, the hierarchical and congregational classifications "are poles on a continuum along which church organizations fall, and it is possible to combine elements of both congregational and hierarchical polities." 77 C.J.S. *Religious Societies* § 8 (Westlaw database updated June 2017). Adding to the problem, at least implicitly, we have recognized that a church can be hierarchical for some purposes, like control and ownership of real property, but not for others. *See St. Andrew's*, 2012 WL 1454846, at *17 ("holding that The Episcopal Church is a hierarchical organization for all purposes, including ownership and control of real and personal property")

12

## C. SUMMARY JUDGMENT

With this background, we turn to the trial court's rulings on the cross-motions for summary judgment. We conclude that the trial court properly denied the motion of the Church Corporation and Dayspring Academy for partial summary judgment, but for different reasons than those relied on by the trial court. We held in *Church of the First Born I* that the Church Corporation lacked standing to assert claims predicated on an interest in the real or personal property of the Church. 2017 WL 2555671, at *6. The holding was based on the conclusion the Church Corporation could not be a successor in interest to the Church without notification to all members of the Church and consent. *Id*.

In examining who might have standing to assert such claims, we concluded that a member of the church congregation would have standing, based on prior precedent of our supreme court, or possibly a trustee holding title to the property at issue. *Id*. at *5 (citing *Nance*, 18 S.W. at 877). We reach the same conclusion here and hold that the Church Corporation lacked standing to seek a congregational vote to determine control of Church property.

For the same reasons, we conclude Dayspring Academy likewise lacked standing to seek a congregational vote to determine control of Church property. Unlike the Church Corporation, Dayspring Academy did not allege that it was a successor in interest corporation to the Church. As alleged in its first amended answer and first amended counterclaim, Dayspring Academy was "the fulfillment of a ministry goal of the [C]hurch's founder Elder P.D. Hardin, as furthered by his successor, Elder Bob Hardin." Dayspring Academy was described as "an integral and inseparable ministry" of the Church Corporation.[10]

The denial of one cross-motion for summary judgment does not necessitate the grant of the competing cross-motion. *CAO Holdings, Inc.*, 333 S.W.3d at 83. In examining the trial court's ruling, we agree that the undisputed facts show that "all Robertson County real estate at issue in this case was held in the name of or by Trustees for the benefit of The Church of the Firstborn, an unincorporated association." But beyond that there are disputed issues of material fact that preclude the grant of summary judgment to the Slagle Plaintiffs.

The Church Corporation and Dayspring Academy[11] argue that "control over the Church's real property require[d] a congregational vote." In support, they cite to specific

_____

[10] Although we conclude that the motion of the Church Corporation and Dayspring Academy for partial summary judgment was properly denied for lack of standing, we express no opinion on their standing to assert the claims alleged in their first amended counterclaim.

[11] Because the issue was raised by neither party, we do not address whether the Slagle Plaintiffs have named the proper party defendants for each of their claims.

13

examples of congregational votes taken before a property transfer. But they have also stated that "the Church ha[d] employed a number of methods when making real property decisions," including "(i) by congregational vote upon the recommendation of the Elder, (ii) by congregational vote upon a vote of recommendations by deacons, and (iii) for minor Church properties, by vote of the deacons upon recommendation of the Elder."

The Slagle Plaintiffs argue that the bylaws allegedly drafted by Elder P.D. Hardin "vest[ed] all business authority in the Board of Deacons." Beyond the bylaws, they argue that there was "a consistent practice of votes [by the Board of Deacons] to approve property transactions." And, contrary to the factual assertion of the Church Corporation and Dayspring Academy, they submit Church records establish "consistent practices" for dealing with property. They acknowledge that Church member votes took place but claim those only occurred after deacon approval. According to the Slagle Plaintiffs, the only instances "of self-autonomous congregational authority" occurred with the sale of properties where members worshiped, which required approval by "a super-majority (two-thirds) of any individual congregation" impacted.

Although we remand the case for a determination of whether the Church was hierarchical or congregational, we note that a determination that the Church was congregational in some respects would not preclude a determination that the Church was hierarchical for other respects. *See St. Andrew's*, 2012 WL 1454846, at *17; 77 C.J.S. *Religious Societies* § 8. Under our case precedent, to require a congregational vote, the church must be congregational for purposes of ownership and control of property. As our supreme court explained, in a congregational church, the will of the majority determines the outcome "*unless there be shown some law, regulation, rule, or practice of the church determining otherwise.*" *Nance*, 18 S.W. at 875 (emphasis added).

### III.

We affirm the denial of the motion of the Church Corporation and Dayspring Academy for partial summary judgment based on their lack of standing. Based on disputed issues of material fact, we reverse the grant of partial summary judgment to the Slagle Plaintiffs. We remand for such other proceedings as are appropriate and consistent with this opinion.

_____
W. NEAL MCBRAYER, JUDGE

14